AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

FILED _____ LODGED
_____ RECEIVED

FEB 1 0 2020

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

Eight Facebook accounts, more particularly described in
Attachment A

)
)
)
)
)
)

Case No. MJ 20 - 5019

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated by reference herein.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC  § 287; 18 USC 371; | False Claims; Conspiracy to Commit Offense or to Defraud United States; Making |
| 18 USC § 1001; 18 USC §☐ | False Statement or Entries; Mail Fraud; Wire Fraud |
| 1341; 18 USC §☐1343 | |

The application is based on these facts:

See Affidavit of Department of Veterans Affairs, Office of Inspector General Special Agent Joseph McGivern

☑ Continued on the attached sheet.

☑ Delayed notice of _365_ days (give exact ending date if more than 30 days: _02/10/2021_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph McGivern, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 02/10/2020 _____

_____
*Judge's signature*

City and state: Tacoma, Washington

David W. Christel, United States Magistrate Judge
*Printed name and title*

## **ATTACHMENT A**
### **Description of Property to be Searched**

1.        This warrant applies to information associated with the Facebook user profiles jewels.pics, kevinmcmains, philip.genz.5, angiegenz, PamSuterMcMains, CenterPointEatonville, and user ID 100008763150849 and group ID 166504783699335, stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  The full URLs for these accounts are as follows:

https://www.facebook.com/jewels.pics

https://www.facebook.com/kevinmcmains

https://www.facebook.com/philip.genz.5

https://www.facebook.com/angiegenz

https://www.facebook.com/PamSuterMcMains

https://www.facebook.com/CenterPointEatonville

https://www.facebook.com/profile.php?id=100008763150849

https://www.facebook.com/groups/166504783699335

ATTACHMENT A - 1
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

**ATTACHMENT B**
**Particular Things to be Seized**

## I.     Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook shall disclose the following information to the government for the user ID listed in Attachment A:

     (a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

     (b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

     (c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

     (d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including the Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

     (e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

     (f)    All "check ins" and other location information;

ATTACHMENT B - 1
USAO #2019R01190

   (g)     All IP logs, including all records of the IP addresses that logged into the account;

   (h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

   (i)     All information about the Facebook pages that the account is or was a "fan" of;

   (j)     All past and present lists of friends created by the account;

   (k)     All records of Facebook searches performed by the account;

   (l)     All information about the user's access and use of Facebook Marketplace;

   (m)     The types of service utilized by the user;

   (n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

   (o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

   (p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

The following information described above in Section I that relates to the ongoing fraud investigation involving Kevin and Jewel McMains, for the user ID, user profiles, and group ID, identified in Attachment A:

   (a)    Any content including e-mails, messages, texts, photographs, visual images, documents, spreadsheets, address lists, and contact lists

   (b)    Any metadata contained in images, to include but not limited to the date, time, and location the image was taken.

ATTACHMENT B - 2
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

(c) All records relating to who created and used the user ID's, and all records identifying any person with whom the user has been in contact

(d) All subscriber records associated with the specified accounts, including name, address, local and long distance telephone connection records, records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service including any credit card or bank account number.

(e) Any and all other log records, including IP address captures, associated with the specified accounts.

(f) Any records of communications between Facebook and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

ATTACHMENT B  - 3
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

# AFFIDAVIT OF JOSEPH MCGIVERN

2 | STATE OF WASHINGTON    )
                                        ) ss.
3 | COUNTY OF PIERCE        )

I, Joseph McGivern, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent with the Department of Veterans Affairs, Office of Inspector General (VA-OIG), assigned to the Seattle field office, and have been since May 2019.  From 1999 to 2019, I was a Special Agent with the Naval Criminal Investigative Service.  Since becoming an investigator, I have received training and conducted investigations related to homicide and suicide, sexual assault, drugs, child abuse and exploitation, fraud, larceny, counterintelligence, and counter-terrorism.  I have found, in my experience, subjects of all types of criminal investigations routinely use digital devices and social media in the commission of a crime or to maintain information that is evidence of a crime.

2.    I make this affidavit in support of an application for a search warrant for the eight Facebook, Inc. (Facebook) accounts with user names "kevinmcmains"; "jewels.pics", "philip.genz.5", "angiegenz", "PamSuterMcMains", "CenterPointEatonville", profile ID "100008763150849",  and group ID "166504783699335" stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A to the requested warrant.  I am seeking a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.  A preservation request for accounts

1  kevinmcmains, jewels.pics, and philip.genz5 was previously sent to Facebook and

2  assigned case number 3959344 on December 11, 2019.

3

| SUBJECT FACEBOOK ACCOUNTS to be Searched: | Paragraphs in Which SUBJECT FACEBOOK ACCOUNTS Are Discussed Herein: |
|---|---|
| https://www.facebook.com/kevinmcmains | 53, 56, 64, 66, 69, 71 |
| https://www.facebook.com/jewels.pics | 44, 49, 50, 51, 52, 53, 55, 57, 58, 59, 60, 61, 62, 63, 67, 70, 72 |
| https://www.facebook.com/philip.genz.5 | 65, 68 |
| https://www.facebook.com/angiegenz | 43 |
| https://www.facebook.com/PamSuterMcMains | 42 |
| https://www.facebook.com/CenterPointEatonville/ | 47 |
| https://www.facebook.com/profile.php?id=100008763150849 | 48 |
| https://www.facebook.com/groups/166504783699335/?tn-str=*F | 45, 46 |

3.      I seek this warrant because there is probable cause to believe that the

Facebook accounts listed in the index above contain photographs, videos, and other

information, posted by Kevin and Jewel MCMAINS (hereafter referred to as MCMAINS

and JEWEL) and others, that will show that he is able-bodied, healthy, active, and

otherwise capable of independently performing activities of daily living, contrary to what

MCMAINS and JEWEL claimed in his applications for benefits to the Department of

Veterans Affairs (VA).  The investigation has shown that MCMAINS and JEWEL have

fraudulently obtained financial benefits from the VA by claiming MCMAINS sustained

physical and psychological injury from an alleged rocket attack that MCMAINS claimed

occurred in October 2007, while he was serving in Iraq.

AFFIDAVIT OF SA MCGIVERN - 2
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1    4.    The facts set forth in this Affidavit are based on my own personal
2  knowledge; knowledge obtained from other individuals during my participation in this
3  investigation, including other law enforcement officers; review of documents and records
4  related to this investigation; communications with others who have personal knowledge
5  of the events and circumstances described herein; and information gained through my
6  training and experience.  Because this Affidavit is submitted for the limited purpose of
7  establishing probable cause in support of the application for a search warrant, it does not
8  set forth each and every fact that I or others have learned during the course of this
9  investigation.
10    5.    Based on my training and experience and the facts as set forth in this
11  affidavit, there is probable cause to believe that violations of False Claims, in violation of
12  18 U.S. Code § 287; Conspiracy to Commit Offense or to Defraud United States in
13  violation of 18 U.S. Code § 371; Making False Statement or Entries Generally, in
14  violation of 18 U.S. Code § 1001, Mail Fraud in violation of 18 U.S.C. 1341, and Wire
15  Fraud in violation of 18 U.S.C. 1343, have been committed by Kevin and Jewel
16  MCMAINS.  I believe the facts contained herein are relevant to the determination of
17  probable cause to believe that evidence, fruits, and instrumentalities of the crimes listed
18  in this paragraph will be found in records relating to the SUBJECT FACEBOOK
19  ACCOUNTS, as further described in Attachment A and Attachment B.

20  ## II.  PROBABLE CAUSE

21  ### A.    *Initiation of the Investigation and Background*

22    6.    This investigation of Kevin and Jewel MCMAINS has uncovered records
23  that indicate the two have fabricated and exaggerated MCMAINS' injuries, limitations,
24  and disabilities in order to fraudulently obtain financial compensation from the VA.  This
25  investigation began in July 2019, after an employee of the VA, Veterans Health
26  Administration, Program of Comprehensive Assistance for Family Caregivers (PCAFC)
27  reported that MCMAINS had applied for the PCAFC in June 2019.  While processing
28  MCMAINS' June 2019 PCAFC application, information surfaced suggesting that

AFFIDAVIT OF SA MCGIVERN - 3
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   MCMAINS was lifting weights and doing light cardiovascular exercise.  This activity is

2   atypical of persons who require a caregiver and indicates that MCMAINS may not

3   require assistance with activities of daily living.  MCMAINS' June 2019 PCAFC

4   application was therefore denied.  In general, the VA considers activities of daily living

5   to be common independent functions typically engaged in everyday life.  These activities

6   include bathing, feeding, dressing, toileting/transferring, adjusting prosthetic devices, and

7   protecting oneself from the hazards of the daily environment.  The VA offers programs to

8   compensate veterans whose service-connected disabilities significantly impact their

9   ability to independently manage their activities of daily living.  These programs are

10  generally reserved for the most drastically injured and impaired veterans.

11        7.      In general, veterans apply for benefits by submitting an application to the

12  VA, which indicates the basis for which the benefit should be paid.  The VA has

13  numerous programs that veterans may apply for, which include education, home loan,

14  fiduciary, service-connected disabilities, and health care.  For service-connected

15  disability benefits, the application is processed by the Veterans Benefits Administration

16  (VBA), a department within the VA.  The VBA employs raters who will evaluate the

17  claim and determine if the veteran's record outright supports the claim or if additional

18  evaluation is needed.  Raters can call for veterans to be examined by medical

19  professionals when necessary to obtain information that will aid in the evaluation and

20  processing of the claim.   The rating process is highly quantifiable, and raters use the

21  information in the veteran's medical record to assign percentages to disabilities which in

22  turn correlate to an appropriate monthly monetary compensation.  Paperwork for these

23  programs can be submitted by mail and online.

24        8.      The PCAFC is a healthcare focused program and falls under the Veterans

25  Health Administration (VHA), another department within the VA.  The PCAFC provides

26  financial compensation to an individual for providing care to qualified veterans/service

27  members. The intent of the program is to compensate caregivers, who are typically

28  family members, for the time they commit to providing the care since it limits their

AFFIDAVIT OF SA MCGIVERN - 4
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   ability to obtain employment. Qualified veterans/service members are those that are

2   unable to care for themselves, who suffer from mental and/or physical disabilities that

3   prevent them from independently accomplishing activities of daily living.  Prior to June

4   2019, MCMAINS and JEWEL had applied twice before to the PCAFC, getting accepted

5   once from 2012 through 2015.

6       **B.      MCMAINS' Statements Regarding the Alleged Rocket Attack**

7           9.      An investigation into MCMAINS' VA and US Army records has

8   uncovered a pattern of submitting baseless and fraudulent claims to the VA for mental

9   and physical service-connected disabilities.  The predication for MCMAINS' claims stem

10  from his 2007 deployment to Iraq.  During that deployment, MCMAINS claims he was

11  exposed to injured and deceased persons.  US Army records do indicate that MCMAINS

12  supported a Casualty Liaison Team in Iraq, however MCMAINS' documented

13  assignment was administrative in nature.  Based on an October 2007 Noncommissioned

14  Officer Evaluation Report from October 2007, MCMAINS' military occupational

15  specialty code while in Iraq was a 42A, Human Resources Specialist.  MCMAINS' daily

16  duties were as follows: "Responsible for accurate updates and personnel service which

17  includes reviewing, processing and uploading Non-Commissioned Officer Evaluation

18  Reports and Officer Evaluation Reports for the Soldiers of 1st Cavalry Division, 1st

19  Infantry Division, 10th Mountain Division, 3-2nd SBCT, and all other units within the

20  MND-B AOR consisting of more than 40,000 Soldiers; responsible for the supervision,

21  health, welfare, counseling and training of two Soldiers."  MCMAINS received a "poor"

22  rating on his October 2007 evaluation report, and it was noted that his integrity was

23  "compromised upon false submission of information."  Medical examinations, and other

24  information uncovered in this investigation, indicate that MCMAINS is exaggerating and

25  feigning the negative impact his experience in Iraq has had on him, and potentially

26  fabricating an alleged rocket attack.

27          10.     MCMAINS claimed to have been exposed to an alleged rocket blast in late

28  October 2007, causing him injury.  No information has been found to confirm this claim.

AFFIDAVIT OF SA MCGIVERN - 5
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  No records have been found that document the alleged rocket blast when it occurred or

2  any treatment MCMAINS would have received immediately after.  The initial reference

3  to the alleged rocket blast is from MCMAINS' self-reporting of his injuries in January of

4  2008.  It appears that through this report MCMAINS was successful in getting the alleged

5  rocket blast included as part of his medical record without providing direct proof that it

6  ever occurred.  From that point forward, all references to the alleged rocket attack are

7  based on comments made by MCMAINS, regurgitation of earlier references in

8  MCMAINS' medical history, or are silent as to their source.  The records that do exist

9  immediately following the alleged rocket blast indicate that it did not occur.  The

10  following is a chronological description of the records which document MCMAINS'

11  medical history immediately following when the alleged rocket attack is said to have

12  occurred.

13         11.     A November 15, 2007, post deployment health assessment reports that

14  while deployed, MCMAINS was not exposed to any type of blast, IED explosion, or any

15  event that would cause a blow to his head.  This is asked in two separate questions in the

16  assessment.  The responses by MCMAINS are consistent, indicating no traumatic event

17  occurred.

18         12.     A November 15, 2007, Individual Readiness Record reports that

19  MCMAINS does not have a non-deployable medical profile and that he is not in a limited

20  duty status.  A deployable solider is one that does not have a service-determined reason

21  that precludes him or her from being moved into and out of an operational area in support

22  of operations.  A soldier in a limited duty status is one that is unable to perform the full

23  range of their assigned responsibilities.  Medical issues are a common reason soldiers are

24  placed in a limited duty status.

25         13.     A November 20, 2007, medical appointment reports that MCMAINS

26  returned from Iraq two weeks prior without injury.  It also reports that MCMAINS has

27  not had any falls within the past three months.

28

AFFIDAVIT OF SA MCGIVERN - 6
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1      14.    A December 18, 2007, chiropractic appointment reports MCMAINS just
2  returned from Iraq without injury. The report indicates that MCMAINS has not suffered
3  new injuries since his last appointment, which occurred on August 16, 2007.

4      15.    Records that do reference the alleged rocket attack differ on the details and
5  when it reportedly occurred.  All records containing information on the alleged rocket
6  attack appear to stem from documents and claims originating from MCMAINS.  On
7  January 25, 2008, MCMAINS completed and submitted a Report of Medical History
8  form in which he stated he was severely wounded by an alleged rocket blast in Iraq on
9  October 29, 2007.  The alleged rocket attack is referenced four separate times in this
10  form.

11      16.    In a March 26, 2008, psychological medical appointment report,
12  MCMAINS reports he was exposed to an alleged blast of a mortar round on October 29,
13  2007.

14      17.    In a September 24, 2008, Medical Evaluation Board-Psychiatric
15  Addendum, MCMAINS reports having been in the blast radius of a rocket that allegedly
16  landed in his compound on October 20, 2007.  Per MCMAINS, the blast knocked him
17  down and caused him to lose consciousness.  MCMAINS reported suffering shrapnel
18  wounds to his upper extremities and face and had an intense fear reaction.

19      18.    In an April 3, 2009, compensation and pension examination, MCMAINS
20  reported he suffered shrapnel wounds after being exposed to RPG fire on October 31,
21  2007.  He alleged the rocket landed about 20 yards from him.

22      19.    In an April 10, 2009, neurology examination, MCMAINS reports he was
23  injured on October 31, 2007, when five 120-mm rockets were launched into his
24  compound.  MCMAINS stated one of the rockets exploded 30 feet in front of him,
25  causing loss of consciousness and shrapnel wounds.

26      20.    In a June 3, 2009, traumatic brain injury evaluation report, MCMAINS
27  reported that he was injured in an alleged rocket attack in Iraq on October 28, 2007.
28  MCMAINS reported he was thrown to the ground and lost consciousness, he suffered

AFFIDAVIT OF SA MCGIVERN - 7
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   numerous small bleeding shrapnel wounds, and the attack caused him to suffer from

2   headaches, an injury to his lower back, and a period of loss of feeling in his legs.  The

3   evaluation report concludes by stating the findings are not consistent with a traumatic

4   brain injury.

5          *C.     MCMAINS' Separation from the Army and Applications for VA Benefits*

6          21.    MCMAINS' US Army records conflict regarding the severity of

7   MCMAINS' injuries.  Notes dated January 29, 2008, from Susan Edgar, LCSW LCDC

8   LMFT, state that MCMAINS is angry and wants out of the Army and that MCMAINS

9   wants the Army to take responsibility for his problems.  On March 12, 2008, MCMAINS

10  reenlisted in the US Army and was deemed to be fully qualified.  Additional notes dated

11  the following day (March 13, 2008) from Edgar state that MCMAINS has panic attacks

12  all day triggered from his service in Iraq.  The note claims that MCMAINS reported

13  neglecting his personal appearance and hygiene, forgetting to shower for two weeks at a

14  time.

15         22.    On April 27, 2009, MCMAINS separated from the US Army.  MCMAINS'

16  DD-214, Certificate of Release or Discharge From Active Duty indicates he was awarded

17  a Purple Heart and a Combat Action Badge.  A review of MCMAINS' military records

18  maintained in the Defense Personnel Records Information Retrieval System found no

19  records that support MCMAINS receiving these medals.  Similarly, the US Army Human

20  Resources Center in Fort Knox, KY also has no supporting documentation for the Purple

21  Heart or the Combat Action Badge.  Coordination has been conducted with US Army

22  Criminal Investigative Division, who has been unable to locate any records that should

23  exist when a Purple Heart is awarded.  A Purple Heart is awarded to service members

24  who are wounded or killed in the line of duty.  The Combat Action Badge is awarded to

25  service members who satisfactorily engage the enemy or are engaged by the enemy.   The

26  only incident referenced in MCMAINS' available records that would support such

27  activity is the alleged October 2007 rocket attack.  In a February 23, 2019, email to the

28  YMCA, MCMAINS connects his claim of receiving a Purple Heart to being hit with a

AFFIDAVIT OF SA MCGIVERN - 8
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  rocket in Iraq.  MCMAINS emailed the YMCA to request a discounted or

2  complementary membership to MCMAINS and his family because he is a Purple Heart

3  recipient.  However as outlined above, references to the rocket attack are inconsistent and

4  records that should confirm the attack indicate that it did not occur.

5        23.  One day after separating from the US Army, on April 28, 2009,

6  MCMAINS received disability ratings from the VA for post-traumatic stress disorder

7  (PTSD) with insomnia and memory lapses at 100%; degenerative disc disease, lumbar

8  with right lower extremity radiculopathy at 40%; patellofemoral syndrome, right at 10%;

9  patellofemoral pain syndrome, left at 10%; and tinnitus at 10%.  On May 13, 2009,

10  MCMAINS received his first monthly tax-free benefits check from the VA for $3,082.00.

11  The payment from the VA was direct deposited into McMAINS' Pentagon Federal Credit

12  Union account.  On October 30, 2009, MCMAINS' cumulative disability rating entitled

13  him to statutory housebound status retroactively from the date he separated from the US

14  Army.  This increased his monthly tax-free benefits check to $3,402.00.

15        24.  MCMAINS has used his disability ratings and the alleged rocket attack as a

16  platform to continuously apply for additional benefits from the VA.  Since separation

17  from the US Army, MCMAINS and JEWEL have provided false information when

18  applying for benefits by US mail, in person, and through eBenefits, a VA online benefits

19  portal.  On October 15, 2009, MCMAINS applied for benefits to allow him to modify his

20  home to accommodate his disabilities.  MCMAINS did not provide any justification for

21  the application.  This application was denied.

22        25.  On May 27, 2011, MCMAINS and JEWEL submitted the first of four

23  applications to the PCAFC.  As part of this process, MCMAINS was required to undergo

24  an eligibility assessment examination.  During this examination MCMAINS reported he

25  required assistance with all activities of daily living except toileting.  MCMAINS also

26  reported needing assistance to remain safe from hazards or dangers in his daily

27  environment.  Based on MCMAINS' responses, the VA determined MCMAINS had a

28  high dependency level and JEWEL was approved as MCMAINS' caregiver.  JEWEL

AFFIDAVIT OF SA MCGIVERN - 9
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  was paid a total of $99,406.17 by the VA to care for MCMAINS through the PCAFC.

2  Jewel received her first PCAFC payment on August 28, 2012 in the amount of $2041.02.

3  Jewel received her last PCAFC payment on December 31, 2015 in the amount of

4  $7541.13.  MCMAINS was removed from the program at the end of 2015 when he was

5  found no longer eligible for the PCAFC due to inconsistencies in his disabilities and

6  limitations.  MCMAINS and JEWEL appealed this decision and submitted multiple

7  statements claiming that MCMAINS required assistance with activities of daily living

8  and that his life is in danger without a caregiver.  A January 3, 2016, memorandum

9  submitted by MCMAINS and JEWEL states that MCMAINS cannot fully dress himself,

10 he almost drowned while bathing, he cannot use the toilet independently, he cannot feed

11 himself, and he requires assistance transferring.  The appeal was denied.

12      26.    On October 17, 2013, MCMAINS submitted a second application to the

13 VA for benefits to allow him to modify his home to accommodate his disabilities.  In the

14 application MCMAINS indicates that being in a wheelchair prevented him from

15 showering and that a full "ADA" modification was done to the home.  In the same

16 application MCMAINS indicates that the second floor of the home is inaccessible to him

17 and that a wheelchair lift needs to be installed.  The application was denied.  On July 30,

18 2019 MCMAINS' Eatonville, WA home was placed on the market and numerous photos

19 made available online.  This is the same home MCMAINS lived in when he submitted

20 the 2013 application and none of the photos suggest any modifications were made to the

21 home to make it more handicap accessible.  MCMAINS lived in this home until July

22 2019.

23      27.    On May 15, 2015, MCMAINS underwent a PTSD examination with the

24 VA.  As a result of this examination, the VA proposed to reduce MCMAINS' PTSD

25 rating from 100% to 30% which would drop his monthly tax-free benefits from $3,856.52

26 to $1,754.71.  In an effort to appeal the VA' proposed reduction, on July 2, 2015,

27 MCMAINS met with Daniel Comsia, a private mental health counselor and contractor for

28 the State of Washington Department of Veterans Affairs.  Comsia completed the same

AFFIDAVIT OF SA MCGIVERN - 10
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   PTSD examination form as was used in the May 15, 2015, examination.  MCMAINS
2   then took the Comsia completed PTSD examination form and changed the responses to
3   indicate his PTSD was much more severe than Comsia had evaluated it to be.  The
4   version of the form submitted to the VA by MCMAINS included some of the following
5   changes: total occupational and social impairment, panic with agoraphobia, cognitive
6   ability greatly impaired by his PTSD, and a Global Assessment of Functioning (GAF) of
7   20.  The GAF scale is used to rate how serious a mental illness may be.  It measures how
8   much a person's symptoms affect his or her day-to-day life on a scale of 0 to 100, with 0
9   being the most impaired.  A score of 20 is indicative of a person in some danger of
10  hurting self or others (e.g., suicide attempts without clear expectation of death, frequently
11  violent, manic excitement) or occasionally fails to maintain minimal personal hygiene
12  (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or
13  mute).  Comsia noted that persons with a GAF of 20 are at Western State Hospital, a
14  psychiatric hospital in Lakewood, WA.
15          28.     MCMAINS used Comsia's signature from the original PTSD examination
16  form to make it appear that the modified form had been completed by Comsia.
17  MCMAINS submitted the modified PTSD examination form to the VA as part of his
18  appeal to maintain his PTSD rating at 100%.  To further support his appeal efforts, on
19  July 29, 2015, MCMAINS submitted VA Form 21-6940, Veteran's Application for
20  Increased Compensation Based on Unemployability to the VA citing PTSD and his
21  medical retirement from Army.  Additionally, MCMAINS and JEWEL provided personal
22  statements to the VA detailing the severity of MCMAINS' condition.  On November 2,
23  2015, the VA reversed the proposed rating reduction decision and maintained
24  MCMAINS' 100% PTSD rating.  In the reversal report, the VA cites the Comsia PTSD
25  evaluation, the VA Form 21-6940, and the personal statements submitted by MCMAINS
26  and JEWEL as evidence for the decision.
27          29.     On September 26, 2019, VA-OIG Special Agent Yilin Wu and I
28  interviewed Comsia.  Comsia reviewed the PTSD examination that contained his

AFFIDAVIT OF SA MCGIVERN - 11
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   signature that was submitted to the VA by MCMAINS. Comsia immediately noted the

2   form had been modified because it was typed. Comsia stated that it is his practice to

3   handwrite the PTSD form. After reviewing the modified form, Comsia noted additional

4   alterations had been made because the responses were excessive as compared to

5   MCMAINS' true condition. Comsia provided a sworn statement to document this matter.

6   Based on their interaction, Comsia was not aware of MCMAINS having any physical

7   limitations.

8       30.     On June 1, 2017, MCMAINS and JEWEL submitted the second of four

9   applications for the PCAFC. This application was denied.

10      31.     Between September 29, 2017, and October 29, 2018, MCMAINS and

11  JEWEL met multiple times with Dr. Dangtuong Nguyen, VA Medical Center at

12  American Lake. MCMAINS and JEWEL regularly reported MCMAINS suffered from

13  difficulties with activities of daily living. On June 10, 2019, MCMAINS and JEWEL

14  met with Nguyen to request he complete VA Form 21-2680, Examination for

15  Housebound Status or Permanent Need for Regular Aid and Attendance on MCMAINS.

16  The VA Form 21-2680 was completed and states that MCMAINS requires assistance

17  with feeding, clothing, bathing, and toileting. It also states that MCMAINS is unable to

18  lift more than five pounds or walk more than ten feet, and that MCMAINS spends 20

19  hours per day in bed.

20      32.     On June 10, 2019, MCMAINS and JEWEL submitted their third of four

21  applications to the PCAFC. This application included the VA Form 21-2680 completed

22  during the Nguyen examination and also included a memorandum dated June 1, 2019,

23  that contained the same language from the January 3, 2016, memorandum, stating

24  MCMAINS cannot fully dress himself, he almost drowned while bathing, he cannot use

25  the toilet independently, he cannot feed himself, and he requires assistance transferring.

26  Their application was again denied. Contributing to the denial were records obtained

27  from Madigan Army Medical Center which identified a November 5, 2018, physician's

28  note claiming that MCMAINS had lost 50 pounds doing light cardio and lifting weights.

AFFIDAVIT OF SA MCGIVERN - 12
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1    33.    The VA Form 21-2680 completed during the Nguyen examination was also

2    used to apply for aid and attendance benefits.  This application was denied on July 10,

3    2019, noting that this benefit is reserved for qualified veterans who are bedridden and so

4    helpless that they require regular assistance.  Available records did not support

5    MCMAINS being in this condition.

6    34.    On September 17, 2019, Social Security Administration-Office of Inspector

7    General Special Agent Rory McPherson and I interviewed Nguyen.  Nguyen confirmed

8    that he treated MCMAINS for back pain and had met with MCMAINS a total of six

9    times, which includes the June 10, 2019, meeting.  In his meetings with Nguyen,

10   MCMAINS presented as requiring assistance ambulating, and relied on a wheelchair,

11   cane, or JEWEL to move around.  MCMAINS and JEWEL told Nguyen that MCMAINS

12   needs assistance with activities of daily living.  MCMAINS and JEWEL requested

13   Nguyen complete the VA Form 21-2680 specifically so it could be included in an

14   application for the PCAFC.  Nguyen only completed the portions of the form that he felt

15   he had enough information to answer based on either his observations of MCMAINS or

16   comments made by MCMAINS and JEWEL.  Nguyen assumes that the remainder of the

17   form was completed by MCMAINS or JEWEL.  The form was signed by Nguyen.

18   35.    In August 2019, MCMAINS and JEWEL relocated to Pensacola, FL and

19   quickly affiliated with the local VA facilities.  On August 16, 2019, MCMAINS met Dr.

20   Thomas Noethlich from the VA Medical Center in Biloxi, MS.  MCMAINS reported that

21   he suffered burns, shrapnel wounds, a traumatic brain injury, and a spinal cord injury

22   from a 120mm rocket explosion in 2007 while in Iraq.  MCMAINS claimed to have been

23   partially paralyzed for two months to two years.

24   36.    On September 23, 2019, MCMAINS and JEWEL met with Nurse

25   Practitioner Elizabeth McCormack, also from the VA Medical Center in Biloxi, MS.

26   MCMAINS and JEWEL reported that JEWEL is MCMAINS' primary caregiver and

27   assists him with multiple activities of daily living, to include showering, toileting,

28

AFFIDAVIT OF SA MCGIVERN - 13
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   medication management, among others.  MCMAINS presented in a wheelchair with

2   sunglasses and relied on JEWEL for assistance with transfer and transportation.

3       37.   On October 18, 2019, MCMAINS and JEWEL made their fourth and most

4   recent applications to the PCAFC.  The application included a copy of the previously

5   submitted June 1, 2019, memorandum stating MCMAINS cannot fully dress himself, he

6   almost drowned while bathing, he cannot use the toilet independently, he cannot feed

7   himself, and he requires assistance transferring.  In processing the application, the VA

8   conducted a phone interview with JEWEL on November 8, 2019.  JEWEL reported that

9   MCMAINS requires assistance with dressing/undressing from the waist down, personal

10  hygiene from the waist down, toileting, prosthetics, and transferring.  JEWEL stated that

11  MCMAINS utilizes a cane daily and the wheelchair on days of acute pain, which is

12  approximately daily.  JEWEL aids MCMAINS with transfers from the seated to standing

13  position and vice versa.  MCMAINS has two external knee braces supplied by VA that he

14  utilizes daily.  The application to the PCAFC was again denied.

15      38.   On December 17, 2019, MCMAINS had a PTSD examination with

16  psychiatrist Anita Nusbaum at the VA Joint Ambulatory Care Center (JACC) in

17  Pensacola, FL.  MCMAINS arrived at the examination in a wheelchair wearing two

18  external knee braces.  JEWEL pushed the wheelchair and MCMAINS was never

19  observed getting out of the wheelchair except to walk the few steps from his vehicle to

20  the wheelchair and vice versa in the parking lot.  After the examination, VA-OIG SA Dan

21  Henson and I interviewed Nusbaum.  During the examination MCMAINS made claims

22  about his condition.  These claims included that he has been in wheelchair since he was

23  blown up in Iraq in 2007, that he does not go anywhere by himself, that he does not have

24  "good" days because his depression is constant, and that he spends one to two days per

25  week in bed.  Nusbaum also met with JEWEL who reported that MCMAINS cannot do

26  much to help around the house, has difficult putting on a shirt, does not like being around

27  other people, and that he suffers from paranoia.  Nusbaum noted that MCMAINS

28  appeared to be exaggerating or feigning his symptoms.  MCMAINS also claimed he

AFFIDAVIT OF SA MCGIVERN - 14
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  could not remember when he last drove a vehicle. I obtained surveillance footage from
2  the JACC parking lot and observed that MCMAINS drove himself and JEWEL to the
3  examination with Nusbaum. The footage shows MCMAINS exit the vehicle by himself
4  with his hood up and sunglasses on. MCMAINS wore external knee braces on both legs
5  and walked to the back of the vehicle where he stood waiting for JEWEL to unload the
6  wheelchair and ready it for him. Once ready, MCMAINS sat in the wheelchair and
7  JEWEL pushed him into the JACC. When leaving the JACC, MCMAINS was seated in
8  the wheelchair and JEWEL pushed him to the vehicle. MCMAINS still had his hoody up
9  and sunglasses on. MCMAINS appeared to be doing something on his phone as JEWEL
10 pushed him. When they arrived at the vehicle, MCMAINS stood up with minimal
11 assistance from JEWEL and walked to the passenger side of the vehicle. MCMAINS
12 was still wearing his knee braces. It cannot be seen how much, if any, assistance JEWEL
13 provides to MCMAINS as he got into the vehicle. JEWEL stowed the wheelchair and
14 drove the vehicle away from the JACC. During her meeting with Nusbaum, JEWEL
15 reported that MCMAINS was driving his parents to the airport a few weeks prior when
16 they visited for Thanksgiving. On the way to the airport MCMAINS got into an accident
17 by rear-ending the car in front of them. JEWEL indicated that they are currently driving
18 a rental vehicle.

19       **D.     *Evidence Contradicting MCMAINS' Disability Claims***

20       39.    In addition to the inconsistencies contained in MCMAINS' medical and
21 claims records, this investigation has uncovered information that directly contradicts
22 information MCMAINS and JEWEL have provided to the VA concerning MCMAINS'
23 medical condition and limitations.

24       40.    On January 21, 2012, MCMAINS and his family returned to their home
25 after being away for a few days due to a power outage. MCMAINS found the kitchen
26 was on fire and attempted to extinguish it. MCMAINS provided a witness statement to
27 the Pierce County Fire Prevention Bureau indicating that to extinguish the fire he grabbed
28 his garden hose and entered the house and ducked under the smoke on his way to the

AFFIDAVIT OF SA MCGIVERN - 15
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  kitchen.  This level of physical and mental activity is inconsistent with how MCMAINS

2  has presented himself to VA.  The January 3, 2016 and June 1, 2019, memorandums

3  mentioned above that were included in MCMAINS' PCAFC applications, state that

4  MCMAINS burned their home down.  These statements are an attempt to draw a direct

5  link between their claim that MCMAINS' is unable to care for himself and was the cause

6  of the fire.  Such a link was not established by the fire investigation.

7        41.    An ongoing review of the Facebook profiles of MCMAINS, JEWEL and

8  some of their friends and family members have uncovered numerous images, videos, and

9  comments that demonstrate MCMAINS is mentally and physically capable.  The

10  information also shows that MCMAINS is functional in public settings.  Below is a

11  description of the identified Facebook content.  The content is listed chronologically

12  based on date posted.

13        42.    A September 2, 2009, post by MCMAINS' mother Pamela Christine

14  McMains (Facebook profile: "PamSuterMcMains") shows a picture of MCMAINS with

15  his two sisters and is dated November 2007.  MCMAINS does not appear to be in a

16  wheelchair or exhibiting any symptoms of being exposed to a rocket blast.

17        43.    An April 17, 2011, post by MCMAINS' sister Angela McMains Genz

18  (Facebook profile: "angiegenz") shows an image of MCMAINS standing up.  The photo

19  is dated April 15, 2011, and MCMAINS is not wearing external knee braces or using any

20  other visible assistive devices.

21        44.    An August 20, 2015, post by JEWEL (Facebook profile: "jewels.pics")

22  shows an image of MCMAINS standing behind a small race car.  MCMAINS is not

23  wearing any knee braces or using any other visible assistive devices.

24        45.    An October 29, 2015, post by Project Odyssey Sunriver (POS) 2015

25  (Facebook group: "166504783699335") shows an image of MCMAINS sitting in a canoe

26  holding a paddle in the middle of a body of water.  A second post by POS on October 29,

27  2015, shows two images of MCMAINS standing in a large room wearing a blindfold.  In

28

AFFIDAVIT OF SA MCGIVERN - 16
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   one image MCMAINS appears to be stretching.  MCMAINS is not wearing any external

2   knee braces or using any other visible assistive devices.

3        46.     An October 30, 2015, post by POS shows an image of MCMAINS and

4   JEWEL standing in what appears to be a transportation terminal.  MCMAINS appears to

5   be holding a coffee and is not wearing any external knee braces or using any other visible

6   assistive devices.

7        47.     An April 23, 2017, post by CenterPoint Church of Eatonville, WA

8   documents a church mission visit to Guatemala in 2014.  The video shows MCMAINS

9   walking without any assistive devices and bending over to work with fresh concrete.  The

10  video also contains freeze frame images of MCMAINS running and jumping rope.

11       48.     A June 19, 2017, post by MCMAINS' daughter Trinity McMains (Trinity),

12  (Facebook profile: "100008763150849") shows an image of Trinity and MCMAINS

13  standing on some uneven rocks in front of a large body of water.  MCMAINS is not

14  wearing any knee braces or using any other visible assistive devices.

15       49.     A May 22, 2018, post by JEWEL shows an image of MCMAINS, JEWEL

16  and their children in the stands of a stadium.  Based on the date and the background, this

17  image appears to be from the Taylor Swift concert that occurred at CenturyLink Field in

18  Seattle, WA on May 22, 2018.

19       50.     A June 8, 2018, post by JEWEL shows an image of MCMAINS sitting in a

20  round bumper boat in a pool.  MCMAINS does not appear to be wearing any floatation

21  devices or external knee braces.

22       51.     JEWEL made multiple posts on June 10, 2018, that contain images and

23  videos of MCMAINS and JEWEL engaged in pugil stick fighting in a large bouncy

24  house.  Pugil stick fighting involves a heavily padded pole-like training weapon that

25  combatants swing at each other in playful contest or training.  MCMAINS can be seen

26  swinging the stick, standing up, falling, rolling over, and balancing on a small unstable

27  platform. MCMAINS is not wearing any external knee braces or using any other visible

28  assistive devices.

AFFIDAVIT OF SA MCGIVERN - 17
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1    52.  JEWEL made multiple posts on February 1, 2019, that contain images of

2 MCMAINS playing basketball.  The images depict MCMAINS jumping, lunging after a

3 basketball, and moving down the court.  MCMAINS is not wearing any knee braces or

4 using any other visible assistive devices.

5    53.  JEWEL made multiple posts on February 3, 2019, that contain an image

6 and videos of MCMAINS using a trampoline to dunk a basketball.  MCMAINS can be

7 seen momentarily hanging on the basketball rim and pulling his knees up before falling

8 onto his buttock on the trampoline.  MCMAINS is not wearing any knee braces or using

9 any other visible assistive devices.

10    54.  A February 6, 2019, post by MCMAINS (Facebook profile:

11 "kevinmcmains") shows an image of MCMAINS holding a TOPS Club Inc. merit

12 certificate indicating he came in first place in his division by losing 50.2 pounds in 2018.

13 TOPS is a weight loss program that stands for "Take Off Pounds Sensibly".

14    55.  A March 23, 2019, post by JEWEL shows an image of MCMAINS smiling

15 in what appears to be stadium seating.  Other people are visible in the background.

16    56.  A March 25, 2019, post by MCMAINS shows an image of what appears to

17 be a smartphone screen capture of a workout summary.  The images states 231 reps,

18 17949 lbs, and 0:48 H.  MCMAINS commented "18 thousand pounds lifted

19 today…damn not bad…".

20    57.  An April 3, 2019, post by JEWEL show MCMAINS sitting at a table

21 playing Monopoly with what appears to be his brother-in-law Philip Genz (Philip) and

22 three of their children.  The comments indicate that MCMAINS won multiple games.

23    58.  A May 4, 2019, post by JEWEL shows MCMAINS standing, wearing a suit

24 and holding a framed TOPS certificate.  MCMAINS is not wearing any external knee

25 braces or using any other visible assistive devices.

26    59.  A May 4, 2019, video posted by JEWEL shows MCMAINS being

27 introduced before a large crowd and holding up a large pair of pants.  The announcer

28 indicates that MCMAINS' pants size has gone from a 4XL to a 1XL.  MCMAINS can be

AFFIDAVIT OF SA MCGIVERN - 18
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1    seen walking across the stage area and is not wearing any external knee braces or using

2    any other visible assistive devices.

3        60.    A May 4, 2019, video posted by JEWEL shows MCMAINS being

4    introduced with multiple other individuals who served in the military. The group is

5    standing in front of a large audience. MCMAINS can be seen placing the American flag

6    in front of the group and returning to his place in line. MCMAINS is not wearing any

7    external knee braces or using any other visible assistive devices.

8        61.    On May 6, 2019, JEWEL posted multiple images of MCMAINS and their

9    children at a bowling alley. MCMAINS can be seen bending over to retrieve a bowling

10   ball and elevating a bowling ball as is done before throwing the ball down the alley.

11   MCMAINS is not wearing any knee braces or using any other visible assistive devices.

12       62.    On May 15, 2019, JEWEL posted multiple images of MCMAINS that are

13   noted as being taken at the Mel Korum Family YMCA in Puyallup, WA. In the images,

14   MCMAINS appears to be engaged in suspension training and is using TRX straps

15   attached to the wall above him to balance himself while he places his feet flat on the wall

16   facing the floor. As he uses his strength to suspend himself completely horizontal to the

17   floor, no part of MCMAINS' body is touching the floor. MCMAINS is not wearing any

18   knee braces or using any other visible assistive devices, other than the straps which are

19   supporting his weight.

20       63.    On June 12, 2019, JEWEL posted an image of MCMAINS and another

21   person in a boat, which appears to be a paddle boat. A life preserver is visible on the

22   back of the boat, but MCMAINS does not appear to be wear any type of flotation device.

23       64.    On July 2, 2019, MCMAINS posted an image of a steak being cooked with

24   the comment that he is giving the power air fryer a shot at cooking his T-bone tonight.

25       65.    On July 4, 2019, Philip (Facebook profile: "philip.genz.5") and MCMAINS

26   posted multiple images and a video of MCMAINS in a hotdog eating contest.

27   MCMAINS commented that he ate seven hotdogs. In the video MCMAINS is seated and

28

AFFIDAVIT OF SA MCGIVERN - 19
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  can be seen feeding himself independently.  MCMAINS is not wearing any type of knee

2  braces.

3       66.     On July 10, 2019, MCMAINS posted an image of a TV dinner.  The

4  comment implies that MCMAINS will be eating TV dinners for a few more weeks while

5  JEWEL is away.  The comments do not indicate if anyone is helping to care for

6  MCMAINS in JEWEL's absence.

7       67.     On August 7, 2019, JEWEL posted a video of her, MCMAINS and other

8  family members walking up to a home.  From the dialogue it can be inferred that

9  MCMAINS is visiting some of his daughters whom he does not live with.  MCMAINS

10  can be seen walking without any knee braces or assistive devices.  MCMAINS can also

11  be seen climbing stairs and driving a vehicle.

12       68.     On August 25, 2019, Philip posted an image of MCMAINS swimming in a

13  large body of water.  The description indicates the photo was taken at Pensacola Beach

14  near Gulf Breeze, FL.  MCMAINS is alone in the photo and the water is up to his neck.

15  No flotation devices are visible in the photo.

16       69.     On September 7, 2019, MCMAINS posted an image of himself, JEWEL

17  and other family members sitting at a restaurant table eating cake.  MCMAINS can be

18  seen holding his own fork and cake.  Car keys are sitting on the table in front of

19  MCMAINS.

20       70.     On September 7, 2019, JEWEL posted an image of MCMAINS and his

21  stepson in a go-cart.  MCMAINS is driving and due to his size, MCMAINS' knees are

22  bent and visible next to the steering wheel.  MCMAINS is not wearing any type of knee

23  brace.

24       71.     On October 9, 2019, MCMAINS posted a photo of himself shooting

25  multiple handguns at a gun range.  MCMAINS is standing the entire time and can be seen

26  walking between tables to access each of the handguns.  MCMAINS is not wearing any

27  knee braces or using any other visible assistive devices. MCMAINS can be seen loading

28

AFFIDAVIT OF SA MCGIVERN - 20
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  the weapons, clearing the weapons, and locking the slides to the rear. The video shows

2  MCMAINS pulling on a rope that appears to reset the metal targets he is shooting at.

3    72.    On November 2, 2019, JEWEL posted multiple images of MCMAINS and

4  other family members in an open field near some airplanes. In the images, MCMAINS

5  can been seen walking, mid-step, with no visible assistive devices or external knee

6  braces. MCMAINS can also be seen bending over with his hands on his knees.

7    73.    The above referenced content from Facebook is relevant to this

8  investigation because it provides images, videos, and comments that are evidence of

9  MCMAINS' mental and physical capabilities. These capabilities directly contradict

10  claims made by MCMAINS and JEWEL to the VA and have served as a basis for the VA

11  to provide MCMAINS and JEWEL financial compensation. Several of these images and

12  videos were shown to Nguyen during the September 17, 2019, interview referenced

13  above. Nguyen was shocked and disappointed to see the drastic differences between the

14  MCMAINS he examined and the MCMAINS seen in the images and videos. Nguyen

15  commented that some of the activities MCMAINS can be seen doing in the Facebook

16  media should not be possible based on his examinations of MCMAINS.

17    74.    MCMAINS currently receives $4,312.76 per month, tax free, from the VA.

18  As of January 15, 2020, MCMAINS has received $484,431.38, tax free, in benefits

19  related to his service-connected disabilities. Since October 15, 2013, MCMAINS has

20  also received a clothing allowance from the VA related to his need to wear two external

21  knee braces. In total, MCMAINS has received $10,244.15, tax free, in clothing

22  allowance benefits. During their period of eligibility, JEWEL was paid a total of

23  $99,406.17 by the VA to care for MCMAINS through the PCAFC.

## III.  BACKGROUND REGARDING FACEBOOK
## SOCIAL NETWORKING SERVICES

26    75.    Facebook owns and operates a free-access social networking website of the

27  same name that can be accessed at http://www.facebook.com. Facebook allows its users

28  to establish accounts with Facebook, and users can then use their accounts to share

AFFIDAVIT OF SA MCGIVERN - 21
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   written news, photographs, videos, and other information with other Facebook users, and,

2   sometimes, with the general public.

3          76.     Facebook asks users to provide basic contact and personal identifying

4   information, either during the registration process or thereafter.  This information

5   includes the user's full name, birth date, gender, contact e-mail addresses, Facebook

6   passwords, Facebook security questions and answers (for password retrieval), physical

7   address (including city, state, and zip code), telephone numbers, screen names, websites,

8   and other personal identifiers.  Facebook also assigns a user identification number to each

9   account.

10         77.     Facebook users may join one or more groups or networks to connect and

11  interact with other users who are members of the same group or network.  Facebook

12  assigns a group identification number to each group.  A Facebook user can also connect

13  directly with individual Facebook users by sending each user a "Friend Request."  If the

14  recipient of a "Friend Request" accepts the request, then the two users will become

15  "Friends" for purposes of Facebook and can exchange communications or view

16  information about each other.  Each Facebook user's account includes a list of that user's

17  "Friends" and a "News Feed," which highlights information about the user's "Friends,"

18  such as profile changes, upcoming events, and birthdays.

19         78.     Facebook users can select different levels of privacy for the

20  communications and information associated with their Facebook accounts.  By adjusting

21  these privacy settings, a Facebook user can make information available only to himself or

22  herself, to particular Facebook users, or to anyone with access to the Internet, including

23  people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

24  friends to facilitate the application of these privacy settings.  Facebook accounts also

25  include other account settings that users can adjust to control, for example, the types of

26  notifications they receive from Facebook.

27         79.     Facebook users can create profiles that include photographs, lists of

28  personal interests, and other information.  Facebook users can post "status" updates about

AFFIDAVIT OF SA MCGIVERN - 22
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  their whereabouts and actions, as well as links to videos, photographs, articles, and other

2  items available elsewhere on the Internet.  Facebook users can also post information

3  about upcoming "events," such as social occasions, by listing the events' time, location,

4  host, and guest list.  In addition, Facebook users can "check in" to particular locations or

5  add their geographic locations to their Facebook posts, thereby revealing their geographic

6  locations at particular dates and times.  A user's profile page also includes a "Wall,"

7  which is a space where the user and his or her "Friends" can post messages, attachments,

8  and links that typically are visible to anyone who can view the user's profile.

9        80.    Facebook allows users to upload photos and videos.  It also provides users

10  the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is

11  tagged in a photo or video, he or she receives a notification of the tag and a link to see the

12  photo or video.  For Facebook's purposes, the photos and videos associated with a user's

13  account will include all photos and videos uploaded by that user that have not been

14  deleted, as well as all photos and videos uploaded by any user that have that user tagged

15  in them.

16        81.    Facebook users can exchange messages on Facebook with other users

17  through a "Private Message" feature.  These messages, which are similar to e-mail and

18  text messages, are sent to the recipient's Facebook "Inbox," which stores copies of

19  messages sent by the recipient.  Facebook users can also post comments on the Facebook

20  profiles of other users or on their own profiles; such comments are typically associated

21  with a specific posting or item on the profile.   Facebook also has a Video Calling

22  feature, and, although Facebook does not record the calls themselves, it does keep records

23  of the date of each call.

24        82.    If a Facebook user does not want to interact with another user on Facebook,

25  the first user can "block" the second user from seeing his or her account.

26        83.    Facebook has a "like" feature that allows users to give positive feedback or

27  connect to particular pages.  Facebook users can "like" Facebook posts or updates, as

28

AFFIDAVIT OF SA MCGIVERN - 23
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1   well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook

2   users can also become "fans" of particular Facebook pages.

3       84.    Facebook has a search function that enables its users to search Facebook for

4   keywords, usernames, or pages, among other things.

5       85.    Each Facebook account has an activity log, which is a list of the user's

6   posts and other Facebook activities from the inception of the account to the present. The

7   activity log includes stories and photos that the user has been tagged in, as well as

8   connections made through the account, such as "liking" a Facebook page or adding

9   someone as a friend. The activity log is visible to the user but cannot be viewed by

10  people who visit the user's Facebook page.

11      86.    Facebook Notes is a blogging feature available to Facebook users, and it

12  enables users to write and post notes or personal web logs ("blogs"), or to import their

13  blogs from other services, such as Xanga, LiveJournal, and Blogger.

14      87.    The Facebook Gifts feature allows users to send virtual "gifts" to their

15  friends that appear as icons on the recipient's profile page. Gifts cost money to purchase,

16  and a personalized message can be attached to each gift. Facebook users can also send

17  each other "pokes," which are free and simply result in a notification to the recipient that

18  he or she has been "poked" by the sender.

19      88.    Facebook also has a Marketplace feature, which allows users to post free

20  classified ads. Users can post items for sale, housing, jobs, and other items on the

21  Marketplace.

22      89.    In addition to the applications described above, Facebook also provides its

23  users with access to thousands of other applications on the Facebook platform. When a

24  Facebook user accesses or uses one of these applications, an update about that the user's

25  access or use of that application may appear on the user's profile page.

26      90.    Some Facebook pages are affiliated with groups of users, rather than one

27  individual user. Membership in the group is monitored and regulated by the

28  administrator or head of the group, who can invite new members and reject or accept

AFFIDAVIT OF SA MCGIVERN - 24
USAO #2019R01190

1   requests by users to enter.  Facebook can identify all users who are currently registered to

2   a particular group and can identify the administrator and/or creator of the group.

3   Facebook uses the term "Group Contact Info" to describe the contact information for the

4   group's creator and/or administrator, as well as a PDF of the current status of the group

5   profile page.

6      91.  Facebook uses the term "Neoprint" to describe an expanded view of a given

7   user profile.  The "Neoprint" for a given user can include the following information from

8   the user's profile:  profile contact information; News Feed information; status updates;

9   links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists,

10   including the friends' Facebook user identification numbers; groups and networks of

11   which the user is a member, including the groups' Facebook group identification

12   numbers; future and past event postings; rejected "Friend" requests; comments; gifts;

13   pokes; tags; and information about the user's access and use of Facebook applications.

14      92.  Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP

15   address.  These logs may contain information about the actions taken by the user ID or IP

16   address on Facebook, including information about the type of action, the date and time of

17   the action, and the user ID and IP address associated with the action.  For example, if a

18   user views a Facebook profile, that user's IP log would reflect the fact that the user

19   viewed the profile, and would show when and from what IP address the user did so.

20      93.  Facebook has a service known as "Facebook Messenger," which allows one

21   Facebook user to communicate directly with another. These messages are stored within

22   the user's profile for an indefinite period of time and can only be deleted by the user.

23   Provided the user had not deleted the messages, Facebook is able to provide this

24   information.

25      94.  Social networking providers like Facebook typically retain additional

26   information about their users' accounts, such as information about the length of service

27   (including start date), the types of service utilized, and the means and source of any

28   payments associated with the service (including any credit card or bank account number).

AFFIDAVIT OF SA MCGIVERN - 25
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

1  In some cases, Facebook users may communicate directly with Facebook about issues

2  relating to their accounts, such as technical problems, billing inquiries, or complaints

3  from other users.  Social networking providers like Facebook typically retain records

4  about such communications, including records of contacts between the user and the

5  provider's support services, as well as records of any actions taken by the provider or

6  user as a result of the communications.

7       95.    Therefore, the records of Facebook are likely to contain all the material

8  described above, including stored electronic communications and information concerning

9  subscribers and their use of Facebook, such as account access information, transaction

10  information, and other account information.

11  **IV.  INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

12       96.    I anticipate executing this warrant under the Electronic Communications

13  Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

14  using the warrant to require Facebook to disclose to the government copies of the records

15  and other information (including the content of communications) particularly described in

16  Section I of Attachment B.  Upon receipt of the information described in Section I of

17  Attachment B, government-authorized persons will review that information to locate the

18  items described in Section II of Attachment B.

19  **V.  REQUEST FOR NONDISCLOSURE AND SEALING**

20       97.    I request, pursuant to the preclusion-of-notice provisions of Title 18, United

21  States Code, Section 2705(b), that Facebook be ordered not to notify any person

22  (including the subscriber or customer to which the materials relate) of the existence of

23  this warrant for such period as the Court deems appropriate.  The government submits

24  that such an order is justified because notification of the existence of this Order would

25  seriously jeopardize the ongoing investigation.  Such a disclosure would give the

26  subscriber an opportunity to destroy change patterns of behavior and to continue his

27  flight from prosecution

28

AFFIDAVIT OF SA MCGIVERN - 26
USAO #2019R01190

1    98.    I further request that the Court order that all papers in support of this
2  application, including the affidavit and search warrant, be sealed until further order of the
3  Court.  These documents discuss an ongoing fraud investigation that is neither public nor
4  known to the target of the investigation.  Accordingly, there is good cause to seal these
5  documents because their premature disclosure may seriously jeopardize the investigation
6  by assisting the target's continued flight from prosecution.
7  //
8  //
9  //
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT OF SA MCGIVERN - 27
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

# VI.  CONCLUSION

99.     Based on the forgoing, I request that the Court issue the proposed search warrant.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(A)(i).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Accordingly, by this Affidavit, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

DATED this 10th day of February, 2020.

_____
Joseph McGivern, Special Agent
Department of Veterans Affairs
Office of Inspector General

SUBSCRIBED AND SWORN before me on this 10th day of February, 2020.

_____
DAVID W. CHRISTEL
United States Magistrate Judge

AFFIDAVIT OF SA MCGIVERN - 28
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

## ATTACHMENT A
### Description of Property to be Searched

1.        This warrant applies to information associated with the Facebook user profiles jewels.pics, kevinmcmains, philip.genz.5, angiegenz, PamSuterMcMains, CenterPointEatonville, and user ID 100008763150849 and group ID 166504783699335, stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  The full URLs for these accounts are as follows:

https://www.facebook.com/jewels.pics

https://www.facebook.com/kevinmcmains

https://www.facebook.com/philip.genz.5

https://www.facebook.com/angiegenz

https://www.facebook.com/PamSuterMcMains

https://www.facebook.com/CenterPointEatonville

https://www.facebook.com/profile.php?id=100008763150849

https://www.facebook.com/groups/166504783699335

ATTACHMENT A - 1
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

**ATTACHMENT B**
**Particular Things to be Seized**

I.      **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook shall disclose the following information to the government for the user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including the Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

ATTACHMENT B - 1
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

The following information described above in Section I that relates to the ongoing fraud investigation involving Kevin and Jewel McMains, for the user ID, user profiles, and group ID, identified in Attachment A:

(a) Any content including e-mails, messages, texts, photographs, visual images, documents, spreadsheets, address lists, and contact lists

(b) Any metadata contained in images, to include but not limited to the date, time, and location the image was taken.

ATTACHMENT B - 2
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830

(c) All records relating to who created and used the user ID's, and all records identifying any person with whom the user has been in contact

(d) All subscriber records associated with the specified accounts, including name, address, local and long distance telephone connection records, records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service including any credit card or bank account number.

(e) Any and all other log records, including IP address captures, associated with the specified accounts.

(f) Any records of communications between Facebook and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

ATTACHMENT B - 3
USAO #2019R01190

UNITED STATES ATTORNEY
1201 PACIFIC AVE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3830